GMP:ABK
F.# 2016R01162

**16M1082**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

XIUBIN YU, ZHAN LIN, TING LIN
and HONGHAI LIN,

                Defendants.

- - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANTS

(T. 18, U.S.C., § 1956(h))

EASTERN DISTRICT OF NEW YORK, SS:

      ERIC A. MILNE, being duly sworn, deposes and states that he is a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such.

      Upon information and belief, on or about and between September 1, 2015 and November 16, 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants XIUBIN YU, ZHAN LIN, TING LIN and HONGHAI LIN, together with others, did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented to be the proceeds of specified unlawful activity and property used to conduct and facilitate specified unlawful activity, to wit: narcotics trafficking, contrary to Title 21, United States Code, Sections 841 and 846, knowing that the transactions were designed in

whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B).

(Title 18, United States Code, Section 1956(h))

The source of your deponent's information and the grounds for his belief are as follows:[1]

## INTRODUCTION

1. I am a Special Agent with the DEA, and have been so employed since approximately July 2014. In my capacity as a DEA Special Agent, I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for federal narcotics offenses, narcotics trafficking into the United States and money laundering offenses. I have participated in investigations involving arrest warrants, and the use of surveillance, confidential informants, cooperating defendants and undercover operations. I have also received training to (a) review and analyze taped conversations and records of drug traffickers and money launderers and (b) debrief cooperating drug traffickers and money launderers. Through my training, education and experience, I have also become familiar with (a) the manner in which illegal drugs are imported and distributed; (b) the method of payment for such drugs; and (c) the efforts of

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

2

persons involved in such activity to avoid detection by law enforcement, such as through the laundering of monetary instruments and the concealment of evidence of crimes.

2. I am familiar with the facts and circumstances set forth below from my participation in the investigation described herein. The facts set forth in this affidavit are based, in part, on information that I have learned from the review of written documents prepared by, and conversations with, members of the DEA and other law enforcement agencies and investigators; surveillance; and my review of documents obtained by subpoena. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## PROBABLE CAUSE TO ARREST THE DEFENDANTS

### A. Background Concerning "Hawala" Money Laundering Transactions

3. Based on my experience, training and participation in this investigation, I understand that the "hawala" system, also known by other names such as "flying money," is an informal monetary remittance system often used to transfer money within the United States and from one country to another. While the hawala system can be used for legitimate purposes at times, the system is also exploited by persons seeking, among other things, to conceal the location, the source, the ownership and/or the control of the proceeds of narcotics trafficking and other unlawful activities. Because hawala transactions are unregulated and not subject to the scrutiny of law enforcement or financial institutions, significant monetary transfers can occur without detection.

4. Typically, a hawala transaction begins when an individual—the sender—wishes to transfer a certain amount of money to an associate—the recipient—either

domestically or overseas. The sender contacts a local "hawaladar" (*i.e.*, an agent, broker or courier in a hawala system) who will charge a percentage to complete the cash transaction. The sender's hawaladar then contacts a hawaladar in the recipient's area who provides the recipient with the designated amount of cash. Once the cash has been transferred to the recipient, a separate transaction can occur between the hawaladars in both the originating and receiving locations. The debt can be reconciled through a number of different means, including the exchange of cash or merchandise, the illicit transfer of cash through couriers, and the laundering of money through legitimate businesses associated with the hawala system.

### B. Evidence of Money Laundering Conspiracy

5.  As described below, XIUBIN YU, ZHAN LIN, TING LIN and HONGHAI LIN (collectively, the "defendants") have conspired to launder money in and around New York City, New York, Los Angeles, California, and elsewhere. Below are summaries of several money laundering transactions conducted by and through the defendants, showing, among other things, that the defendants are involved in laundering bulk cash represented to be the proceeds of, and money used in, narcotics trafficking.

#### i. September 2015 Transaction

6.  According to records of the State of California, Secretary of State, XIUBIN YU is the Chief Executive Officer, Secretary and Chief Financial Officer of a "wholesale and retail trading company" located in Monterey Park, Los Angeles County, California (the "California Store"), the name and address of which are known to the undersigned Affiant.

4

7. On or about September 8, 2015, a confidential source working with the DEA (the "CW"),[2] whose identity is known to the undersigned Affiant, had a face-to-face meeting with XIUBIN YU at the California Store. In a recorded conversation, YU told the CW that YU can transfer cash from New York to Los Angeles for a 3.5 percent commission of the total amount transferred. YU explained that cash that is handed off to an associate in New York can be released in Los Angeles in approximately two days. YU also stated that she moves money from the United States to China. The CW told YU that the money that s/he wanted to move from New York to Los Angeles was derived from the sale of marijuana.

8. During the September 8, 2015 meeting, YU provided the CW with a telephone number with a 646 area code (the "646 number"), known to the undersigned Affiant, which is an area code that covers parts of New York City. YU stated that the CW should call the 646 number if s/he needed to move money and explain that s/he is calling on behalf of "Mr. Wong." YU also provided the CW with a 626 area code number and stated that the number was hers. The 626 area code covers parts of Los Angeles County, California.

9. The next day, on September 9, 2015, a DEA Special Agent acting in an undercover capacity ("UC-1"), whose identity is known to the undersigned Affiant, called the 646 number and spoke with an individual later identified as ZHAN LIN. UC-1 stated that s/he was calling on behalf of "Mr. Wong" for "Little Brother." During the recorded

---

[2] In January 2016, the CW pleaded guilty to conspiracy to transport and harbor aliens, in violation of Title 8, United States Code, Section 1324. The CW was principally sentenced to time served and three years of supervised release. Information provided by the CW has been reliable and is corroborated by other evidence.

5

conversation, UC-1 and ZHAN LIN agreed to meet at 6:30 p.m. that day, at the intersection of Chatham Square and East Broadway, in Manhattan, New York.

10. Shortly after 7:00 p.m. that day, UC-1 telephonically contacted ZHAN LIN and advised that s/he had arrived and was waiting at the agreed-upon location. ZHAN LIN then returned UC-1's phone call, and UC-1 observed a Chinese male on a cell phone looking toward UC-1's vehicle. Minutes later, ZHAN LIN entered the front passenger seat of UC-1's vehicle. At this time, UC-1 said that Mr. Wong told him/her to drop off "8," meaning $80,000 in United States currency, and UC-1 pointed to a white plastic bag containing a cardboard box that contained $80,000.[3] UC-1 stated that ZHAN LIN should call "Big Sister" and tell her that ZHAN LIN was in receipt of the currency. During the meeting in UC's vehicle, ZHAN LIN asked detailed questions about "Big Sister," such as the sound of her voice. During the meeting, the CW called UC-1 upon UC-1's prompting and the CW spoke directly to ZHAN LIN about "Big Sister." Shortly thereafter, ZHAN LIN hung up the phone and took the bag containing $80,000 from UC-1. ZHAN LIN then asked UC-1 to drop him off at the corner of East Broadway and Eldridge Street in Manhattan and that the next time UC-1 had to meet ZHAN LIN, UC-1 should meet him at this intersection.

11. The next day, on September 10, 2015, the CW called the 626 number and spoke with YU, advising her that s/he was on his/her way to the California Store. Shortly thereafter, the CW arrived at the California Store, met with YU and exited the store carrying a white plastic bag. Agents searched the bag and recovered, among other things, a

---

[3] All currency referenced herein is United States currency.

6

black bag contained therein which revealed a large quantity of bulk United States currency, specifically, $77,600, representing the $80,000 collected by ZHAN LIN, less a three percent commission. Based on my training and experience, I understand that such commissions often vary based on a number of circumstances, including how quickly funds can be paid and the denominations of the currency paid, and that commissions generally vary between approximately two and four percent.

### ii. October 2015 Transaction

12. On October 1, 2015, the CW, acting under the direction of DEA agents, spoke with YU by telephone, via YU's 626 number, about the transfer of $120,000 from New York to Los Angeles. YU stated that this transaction would not involve the use of telephones, but instead, the individual delivering cash in New York would meet at a specified time and at the same location as on the previous occasion. YU asked the CW if the same person in New York would drop off the money, and the CW responded in the affirmative.

13. A short while later, the CW and YU spoke again, via YU's 626 number, and YU provided the serial number 39986421, which was to be given to the person dropping off the money in New York, together with a 917 area code telephone number (the "917 number"), known to the undersigned Affiant. YU stated that the person dropping off the money in New York would receive a dollar bill with this number on it from the person designated to receive the $120,000 in cash, so as to indicate to that the recipient and YU are working together and the recipient is, in fact, the person to whom the cash should be provided. YU stated that the transfer of cash would take place in New York at approximately 5:00 p.m. local (Eastern) time.

7

14. Later that day, on October 1, 2015, at approximately 3:30 p.m. Eastern Time, UC-1 called the 917 number and spoke with ZHAN LIN. UC-1 stated that s/he was calling on behalf of "Mr. Wong" for "Little Brother." During the call, UC-1 and ZHENG agreed to meet at 5:00 p.m. at the intersection of East Broadway and Forsyth Street in Manhattan.

15. At approximately 5:30 p.m., ZHAN LIN entered the front passenger side of UC-1's vehicle, and the vehicle drove away. ZHAN LIN greeted UC-1 and provided a one-dollar bill with serial number L39986421A, which contained the same numerical code provided by YU earlier that day. After verifying the serial number, UC-1 stated that "Mr. Wong" told him/her to drop off "12," meaning $120,000 in United States currency. While in the car, ZHAN LIN asked UC-1 whether the cash consisted of many "small bills." Based on my training, experience and familiarity with this investigation, I understand that large amounts of cash in small denominations, such as 20-dollar bills, are consistent with street-level drug trafficking.

16. Several minutes later, ZHAN LIN exited UC-1's vehicle at the intersection of Eldridge and Canal Streets in Manhattan, carrying a weighted-down plastic bag bearing the logo "H&M." Moments later, ZHAN LIN was observed entering a retail store advertising money transfer services, and less than 15 minutes later, was observed exiting the store carrying a flat, and apparently empty, H&M bag.

17. Thereafter, on October 5, 2015, the CW, acting at the direction of DEA agents, entered the California Store and was met by YU, who gave $80,000 to the CW in a plastic bags, with the balance to be provided in two days.

18. Two days later, on October 7, 2015, the CW again went to the California Store and was met at the rear entrance by TING LIN, who identified herself as YU's daughter. TING LIN then gave $36,400 to the CW in plastic grocery bags, which, together with the $80,000 provided by YU on October 5, 2015, represented the $120,000 originally provided to ZHAN LIN in New York, less the agreed-upon three percent commission of $3,600.

19. Later that month, on October 22, 2015, the CW met with YU at the California Store at the direction of DEA agents. On that occasion, the CW and YU spoke in the back room of the California Store, accompanied by HONGHAI LIN. The CW explained that an individual ("Individual #1"), whose identity is known to the undersigned Affiant, recently had a trailer with 3,000 pounds of marijuana and approximately $300,000 in United States currency seized by DEA agents in Queens, New York. YU stated that she dealt with Individual #1 and had laundered money for Individual #1, specifically, "5, 10 or 20 pieces." Based on my training, experience and familiarity with this investigation, as well as and the coded language used by co-conspirators to discuss sums of money, I believe that "5, 10 and 20 pieces" refers to $50,000, $100,000 and $200,000 in United States currency, respectively.

20. During this meeting, YU offered to charge a 2.8 percent commission instead of three percent because of the seizure in New York and how it may affect the CW's business. The CW also discussed laundering $100,000 with YU in approximately one to two weeks' time, or as soon as the CW sold "toyma." Based on my training, experience and familiarity with this investigation, as well as a certified translation conducted pursuant to the DEA's request, I understand that "toyma" refers to marijuana in the Fuzhou dialect. YU

9

also told the CW that she has associates in Canada that may be interested in participating in the marijuana business with the CW. YU further stated that she has approximately one to two million dollars that she can use to move money from China and that she would charge a five percent commission to move money between China and the United States. Based on my training, experience and familiarity with this investigation, I understand that money launderers often charge a higher commission when laundering money between countries.

### iii. November 2015 Transaction

21. On November 11, 2015, YU provided the CW with another 646 area code number, which is known to the undersigned Affiant, to coordinate the collection of money in New York City. On November 12, 2015, UC-1 called this number and spoke with an individual later identified as HONGHAI LIN, stating that s/he was calling on behalf of "Mr. Wong for Little Brother." During the call, UC-1 and HONGHAI LIN agreed to meet at 4:30 p.m. on that date, at the intersection of 49th Street and 6th Avenue in Brooklyn, New York.

22. At approximately 4:36 p.m., UC-1 telephonically contacted HONGHAI LIN and advised that s/he was waiting at the agreed-upon location in Brooklyn. HONGHAI LIN stated that he was on his way to the meeting location. At approximately 4:47 p.m., HONGHAI LIN entered UC-1's vehicle carrying a red plastic bag. While inside the vehicle, UC-1 stated that Mr. Wong told him/her to drop off "10," meaning $100,000 in United States currency. UC-1 provided a white plastic shopping bag that contained $100,000 and HONGHAI LIN thereafter exited the vehicle with the white bag.

10

23. Later that day, on November 12, 2015, the CW, acting at the direction of DEA agents, went to the California Store where s/he was greeted by YU. At that time, YU provided the CW with $98,000 in cash, representing the original $100,000, less YU's agreed-upon two percent commission. Also during the meeting, YU and the CW discussed going into the marijuana business together. YU discussed having the CW locate and set up homes and warehouses in which to grow marijuana, and having marijuana growers travel from Canada to assist with growing operations. YU also mentioned that there are multiple locations in Sacramento, California being used to grow marijuana and offered to sell that marijuana to the CW. The CW mentioned to YU that Individual #1's large marijuana seizure in New York was adversely affecting the CW's business. YU's daughter, TING LIN, was present during the foregoing money transfer and conversation between YU and the CW concerning marijuana business activities.

### iv. December 2015 Transaction

24. On December 28, 2015, the CW called YU at the 626 number and told her that s/he had $190,000 in United States currency to drop off in New York. YU provided the CW with a 646 area code number to arrange the money pick-up in Brooklyn. YU directed the CW to indicate that s/he is calling on behalf of "Chen."

25. Later that day, UC-1 dialed the number provided by YU and spoke with ZHAN LIN, telling him s/he was calling on behalf of "Chen." During the call, ZHAN LIN and UC-1 planned to speak the following day to schedule a time to meet.

26. The next day, on December 29, 2015, UC-1 and ZHAN LIN spoke by telephone and agreed to meet at 2:00 p.m. that day on 48th Street between 6th and 7th

Avenues in Brooklyn so that UC-1 could deliver cash to ZHAN LIN. Shortly after 2:00 p.m., UC-1 called ZHAN LIN and advised that s/he had arrived at the location, and LIN stated that he was on his way. ZHAN LIN arrived a few minutes later and entered the front passenger side of UC-1's vehicle, greeting UC-1. UC-1 then gave ZHAN LIN a white paper shopping bag that contained $190,000 in cash. ZHAN LIN then directed UC-1 to circle the block and drop off LIN in front of LIN's vehicle. After UC-1 complied, ZHAN LIN exited UC-1's vehicle with a bag containing the cash.

27. Later that day, on December 29, 2015, the CW went to the California Store to collect the money. YU and HONGHAI LIN were in the store. YU provided the CW with $100,000 in United States currency and told him/her that the remaining amount would not be available for pick up until the following day. The CW told YU that s/he needed the money sooner to buy marijuana. During the conversation, for which HONGHAI LIN was present, YU asked the CW to find a warehouse in the Los Angeles area, and YU would supply workers to run a marijuana grow operation.

28. At approximately 1:00 p.m. on December 30, 2015, the CW returned to the California Store, where YU and HONGHAI LIN were present. YU gave the CW a plastic bag that contained $30,000 and the CW departed. Shortly thereafter, the CW called YU and told her that s/he would return for the balance. The CW returned later that day and YU gave him/her another plastic bag that contained $40,000. The CW returned a third time that same day, and YU gave the CW a plastic bag that contained $16,200. YU apologized for the length of time it took to provide the CW with the total amount of cash. Between

12

December 29 and 30, 2015, YU gave the CW a total of $186,200, representing the original $190,000, less YU's two percent commission.

### v. January 2016 Bulk Cash Seizure

29. On January 5, 2016, law enforcement officers stopped ZHAN LIN at Newark Liberty International Airport in Newark, New Jersey, while he was on his way to board a flight to Burbank, California, via Denver, Colorado.[4] During the passenger screening process, officers of the Transportation Security Administration x-rayed and physically inspected ZHAN LIN's carry-on luggage and recovered $45,000 in United States currency from a McDonald's restaurant bag contained within his carry-on luggage, secured among articles of clothing. ZHAN LIN was asked in the Mandarin language about how much money he had, and he responded $45,000. ZHAN LIN also stated that the money was wired to him by his cousin in China in November 2015 because his cousin planned to travel to California and needed money to spend and gamble while in California. ZHAN LIN later stated that the money was given to him in New York, in person, by an individual who ZHAN LIN stated was his cousin's wife who lives in California. ZHAN LIN also said that he did not know why he previously said that the money had been wired to him. ZHAN LIN also stated that he works at his mother's store and provided the name and street address for the California Store.

30. Law enforcement personnel seized the $45,000. Later that day, a certified narcotics detection canine handler exposed the currency to his trained canine for

---

[4] Burbank's Bob Hope Airport is located in Los Angeles County, California.

inspection and review. The canine indicated a positive alert for the presence of controlled substances or residues thereof on the currency.

### vi. November 2016 Transaction

31. On November 15, 2016, YU provided the CW with a telephone number, which is known to the undersigned Affiant, to coordinate the collection of money in New York, together with a code phrase known to the undersigned Affiant.

32. Later that day, a DEA Special Agent acting in an undercover capacity ("UC-2"), whose identity is known to the undersigned Affiant, called the telephone number provided by YU. A female answered the phone. UC-2 provided the female with the code phrase that YU had provided to the CW, after which UC-2 and the female made arrangements to meet the following day, after approximately 3:00 p.m., in Brooklyn. UC-2 indicated that s/he would drop off "12," meaning $120,000.

33. The next day, on November 16, 2016, UC-2 called the same telephone number and spoke with the same female UC-2 he had spoken with the previous day. The female told UC-2 to meet at an address on Sixth Avenue between 50th and 51st Streets in Brooklyn (the "Brooklyn Location"), known to the undersigned Affiant.

34. At approximately 4:35 p.m. on November 16, 2016, TING LIN was observed exiting a residential apartment building (the "Residence"), the address of which is known to the undersigned Affiant, located approximately two blocks from the Brooklyn Location. TING LIN was accompanied by a small child, who she placed into a baby stroller. After a few minutes, TING LIN arrived, on foot, at the front passenger side of UC-2's vehicle, still accompanied by the small child in the stroller. TING LIN then leaned

through the open front passenger-side window of UC-2's vehicle, at which time UC-2 told TING LIN that s/he had included an additional $5,000 beyond the $120,000 UC-2 had previously stated s/he would drop off because UC-2 had made an additional sale of marijuana on the way to meet TING LIN. TING LIN then retrieved a weighted-down grey drawstring bag that contained $125,000. TING LIN thereafter pushed the stroller away from UC-2's vehicle, entered into a nearby business, looked around, and then immediately exited the business. TING LIN then walked toward the Residence, which she entered at approximately 5:00 p.m. with the aforementioned weighted-down grey drawstring bag and the small child.

35. Later that day, November 16, 2015, the CW, acting at the direction of DEA agents, went to the California Store where s/he was greeted by YU. At that time, YU provided the CW with $121,875 in cash, representing the original $125,000, less YU's agreed-upon 2.5 percent commission.

## CONCLUSION AND SEALING REQUEST

36. Based upon the foregoing, I submit that there exists probable cause to believe that defendants XIUBIN YU, ZHAN LIN, TING LIN and HONGHAI LIN did knowingly and intentionally conspire to conduct one or more financial transactions in and affecting interstate and foreign commerce, to wit: the transfer and delivery of United States currency, which transactions involved property represented to be the proceeds of specified unlawful activity and property used to conduct and facilitate specified unlawful activity, to wit: narcotics trafficking, contrary to Title 21, United States Code, Sections 841 and 846, knowing that the transactions were designed in whole and in part to conceal and disguise the

nature, the location, the source, the ownership and the control of the proceeds of the specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3)(B), in violation of Title 18, United States Code, Section 1956(h).

WHEREFORE, your deponent respectfully requests that arrest warrants be issued so that the defendant defendants XIUBIN YU, ZHAN LIN, TING LIN and HONGHAI LIN may be dealt with according to law.

IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this affidavit and the requested arrest warrants. Based upon my training and experience, I have learned that criminals actively search for criminal affidavits via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Therefore, premature disclosure of the contents of this affidavit and related documents will seriously jeopardize the investigation, including by giving targets an

opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

Dated: Brooklyn, New York
      November 29, 2016

                                          ERIC A. MILNE
                                          Special Agent
                                          Drug Enforcement Administration

Sworn to before me this
29 day of November, 2016

s/Orenstein

THE HONORABLE JAMES ORENSTEIN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

17

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the
Eastern District of New York

| United States of America | ) |
|---|---|
| v. | ) Case No. **16M1082** |
| XIUBIN YU | ) |
| *Defendant* | ) |

## ARREST WARRANT

To:   Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   XIUBIN YU                                                                                              ,
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment   ☐ Superseding Indictment   ☐ Information   ☐ Superseding Information   ☑ Complaint
☐ Probation Violation Petition   ☐ Supervised Release Violation Petition   ☐ Violation Notice   ☐ Order of the Court

This offense is briefly described as follows:
Money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h).

Date: 11/29/16  11:00 m                                                _____
                                                                        *Issuing officer's signature*

City and state:   Brooklyn, New York                                   HONORABLE JAMES ORENSTEIN
                                                                        *Printed name and title*

---

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____.

Date: _____                                                    _____
                                                                        *Arresting officer's signature*

                                                                        _____
                                                                        *Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____  Weight: _____

Sex: _____  Race: _____

Hair: _____  Eyes: _____

Scars, tattoos, other distinguishing marks: _____

History of violence, weapons, drug use: _____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

FBI number: _____

Complete description of auto: _____

Investigative agency and address: _____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____